Jason C. Murray (CA Bar No. 169806)
CROWELL & MORING LLP
515 South Flower St., 40th Floor
Los Angeles, CA 90071
Telephone:  213-443-5582
Facsimile:  213-622-2690
Email:  jmurray@crowell.com

Jerome A. Murphy (*pro hac vice*)
Astor H.L. Heaven (*pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone:  202-624-2500
Facsimile:  202-628-5116
E-mail:  jmurphy@crowell.com
                aheaven@crowell.com

*Counsel for ViewSonic Corporation*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

| | |
|---|---|
| VIEWSONIC CORPORATION,<br><br>Plaintiff<br><br>v.<br><br>CHUNGHWA PICTURE TUBES, LTD.;<br>CHUNGHWA PICTURE TUBES<br>(MALAYSIA); IRICO GROUP<br>CORPORATION; IRICO GROUP<br>ELECTRONICS CO., LTD.; IRICO DISPLAY<br>DEVICES CO., LTD.; LG ELECTRONICS,<br>INC.; LG ELECTRONICS USA, INC.; LP<br>DISPLAYS INTERNATIONAL LTD.;<br>PANASONIC CORPORATION; PANASONIC<br>CORPORATION OF NORTH AMERICA; MT<br>PICTURE DISPLAY CO., LTD.; BEIJING<br>MATSUSHITA COLOR CRT CO., LTD.;<br>KONINKLIJKE PHILIPS ELECTRONICS<br>N.V.; PHILIPS ELECTRONICS NORTH<br>AMERICA CORPORATION; PHILIPS<br>ELECTRONICS INDUSTRIES (TAIWAN),<br>LTD.; PHILIPS DA AMAZONIA INDUSTRIA<br>ELECTRONICA LTDA.; SAMSUNG SDI CO.,<br>LTD.; SAMSUNG SDI AMERICA, INC.; | Master File No. 3:07-cv-05944-SC<br><br>MDL No. 1917<br><br>Individual Case No. 3:14-cv-02510<br><br><br>**COMPLAINT FOR DAMAGES AND<br>INJUNCTIVE RELIEF [REDACTED]**<br><br><br>**DEMAND FOR JURY TRIAL** |

SAMSUNG SDI MEXICO S.A. DE C.V.;
SAMSUNG SDI BRASIL LTDA.; SHENZHEN
SAMSUNG SDI CO., LTD.; TIANJIN
SAMSUNG SDI CO., LTD.; SAMSUNG SDI
(MALAYSIA) SDN. BHD.; SAMTEL COLOR
LTD.; THAI CRT CO., LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA, INC.;
TOSHIBA AMERICA CONSUMER
PRODUCTS, LLC; TOSHIBA AMERICA
ELECTRONIC COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC.; TECHNICOLOR SA (f/k/a
THOMSON SA); TECHNICOLOR USA, INC.
(f/k/a THOMSON CONSUMER
ELECTRONICS, INC.); MITSUBISHI
ELECTRIC CORPORATION; MITSUBISHI
ELECTRIC VISUAL SOLUTIONS AMERICA,
INC.; and MITSUBISHI ELECTRIC &
ELECTRONICS USA, INC.

                              Defendants

ViewSonic Corporation ("ViewSonic") for its Complaint against all Defendants named herein, hereby alleges as follows:

I.    **INTRODUCTION**

1.      Defendants and their co-conspirators formed an international cartel which conducted a long-running conspiracy extending at a minimum from at least March 1, 1995, through at least November 25, 2007 (the "Relevant Period"). The purpose and effect of this conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs"). Defendants are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors). For the purposes of this Complaint, CPTs and CDTs of all sizes shall be referred to collectively as "CRTs."

2.      ViewSonic purchased CRTs and products containing CRTs directly from Defendants and their co-conspirators. As a result of Defendants' and their co-conspirators' illegal conspiracy, ViewSonic paid artificially-inflated prices for CRTs. Thus, ViewSonic suffered damages as a result of

Defendants' and their co-conspirators' conspiracy, and brings this action to recover the overcharges paid for the CRTs it purchased during the Relevant Period.

3. During the Relevant Period, Defendants and their co-conspirators controlled the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue. During the Relevant Period, virtually every household in the United States owned at least one product containing a CRT.

4. Since the mid-1990s, the CRT industry faced significant economic pressure as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry. In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants and their co-conspirators conspired, combined, and contracted to fix, raise, maintain, and stabilize the price at which CRTs were sold in the United States.

5. With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia,* shipments, prices, production and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the Defendants and co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

6. The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period. Also beginning in 1995, the Defendants and co-conspirators began to engage in informal group meetings. By 1997, these group meetings had become more formalized, as described in greater detail below. There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings. These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K., Europe, and the United States. These

3

meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

7. During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

8. This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities, including the European Commission, the Korean Fair Trade Commission, and the Japan Fair Trade Commission. Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) was subpoenaed by the DOJ in connection with its investigation of CRT price-fixing. Technicolor SA is the subject of an investigation by the Mexican Federal Competition Commission, and its affiliate in Brazil is under investigation by the Brazilian Ministry of Justice for fixing the prices of CRTs. The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009. Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

9. On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs. On May 12, 2011, the United States and Samsung SDI entered into an amended plea agreement, where Samsung SDI pled guilty to violating the Sherman Antitrust Act, 15 U.S.C. § 1, from at least as early as January 1997, until at least as late as March 2006.

10. During the Relevant Period, ViewSonic purchased CRTs in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled. ViewSonic thus suffered damages as a result of Defendants' conspiracy, and brings this action to recover the overcharges paid for the CRTs purchased during the Relevant Period.

## II. JURISDICTION AND VENUE

11. ViewSonic brings this action under Section 1 of the Sherman Act, 15 U.S.C. §1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to obtain treble damages for its direct purchases of CRTs from certain Defendants and for injunctive relief against all Defendants.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

12.     This Court has jurisdiction under 28 U.S.C. §§1331 and 1337 over ViewSonic's claims arising under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act.

13.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial, and reasonably foreseeable effect on United States domestic and import trade or commerce. This effect gave rise to ViewSonic's antitrust claims.  During the Relevant Period, Defendants and their co-conspirators' conspiracy affected the prices of the CRTs ViewSonic purchased in the United States.

14.     This court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act, 15 U.S.C. § 22.  The activities of Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have a direct and substantial effect on commerce in California.  In particular, Defendants' and their co-conspirators' conspiracy directly and substantially affected the price of CRTs purchased in California. These effects also give rise to ViewSonic's antitrust claims.  ViewSonic maintained its headquarters in California during and after the Relevant Period.  Each Defendant conducts substantial business in the state of California, and a number of Defendants maintain their headquarters in this District or elsewhere in California.  In addition, Defendants all purposefully availed themselves of the laws of the United States and California insofar as they manufactured CRTs and products containing CRTs for sale in the United States and California. Samsung SDI has also admitted that conduct in furtherance of the conspiracy occurred in the Northern District of California.

15.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. §22 and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.  In addition, venue is proper in this District under 28 U.S. § 1391 because a substantial part of the events or admissions giving rise to this claim occurred in this District.

III.    **THE PARTIES**

A.      **Plaintiff ViewSonic Corporation**

16.     Plaintiff ViewSonic Corporation is a Delaware corporation with its headquarters in Walnut, California.  During the Relevant Period, ViewSonic purchased substantial amounts of CRTs

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1   manufactured by Defendants, their co-conspirators, and others.  As a result of Defendants' and their co-
2   conspirators' illegal conspiracy, ViewSonic was injured in its business and property because the prices it
3   paid for such CRTs were artificially inflated by that conspiracy.

4       17.    During the Relevant Period, invoices for CRTs and consumer electronics products
5   containing CRTs were sent to ViewSonic in the United States, and paid for by ViewSonic in the United
6   States.  This process was spearheaded by ViewSonic's procurement team, which was also responsible
7   for selecting vendors and product lines with respect to CRTs.

8       **B.**    **The Defendants**

9           **1.**    **IRICO Entities**

10       18.    Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal
11   place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGC is the parent
12   company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of
13   CRTs.  During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRTs, either
14   directly or through its subsidiaries or affiliates, throughout the United States.

15       19.    Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its
16   principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGE is
17   owned by Defendant IGC.  According to its website, IGE was the first CRT manufacturer in China and
18   one of the leading global manufacturers of CRTs.  Their website also claims that in 2003, they were the
19   largest CRT manufacturer in China in terms of production and sales volume, sales revenue and
20   aggregated profit, and taxation.  During the Relevant Period, IGE manufactured, marketed, sold and/or
21   distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.
22   Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the
23   antitrust violations alleged in this complaint.

24       20.    Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its
25   principal place of business located at No. 16, Fenghui South Road West, District High-tech
26   Development Zone, Xi'an, SXI 710075.  IDDC is a partially-owned subsidiary of Defendant IGC.  In
27   2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured, marketed,
28   distributed and/or sold CRTs, either directly or through its subsidiaries or affiliates, throughout the

6

United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in this complaint.

21.     Defendants IGC, IGE and IDDC are collectively referred to herein as "IRICO."

**2.      LG Electronics Entities**

22.     Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968.  The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

23.     Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.  During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

24.     Defendants LGEI and LGEUSA are collectively referred to herein as "LG Electronics."

**3.      LP Displays**

25.     Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.  In March 2007, LP Displays became an independent company.  LP Displays was a leading supplier of CRTs for use in television sets and

computer monitors with annual sales for 2006 of over $2 billion and a market share of 27%.  LP

Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company

and the shares would be owned by financial institutions and private equity firms.  During the Relevant

Period, LP Displays manufactured, marketed, sold and/or distributed CRTs, either directly or through its

subsidiaries or affiliates, throughout the United States.

### 4.    Panasonic Entities

26.    Defendant Panasonic Corporation, which was at all times during the Relevant Period

known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation on October 1,

2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  During

the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRTs,

either directly or through its subsidiaries or affiliates, throughout the United States.

27.    Defendant Panasonic Corporation of North America ("PCNA") is a Delaware corporation

with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094.  PCNA

is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  During the Relevant

Period, PCNA manufactured, marketed, sold and/or distributed CRTs, either directly or through its

subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and

controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this

complaint.

28.    Defendants Panasonic Corporation and PCNA are collectively referred to herein as

"Panasonic."

29.    Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co.,

Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan.

In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba Corporation called

Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs.  Panasonic Corporation was the

majority owner with 64.5 percent.  On March 30, 2007, Panasonic Corporation purchased the remaining

35.5 percent stake in the joint venture, making Matsushita Picture Display Co., Ltd. a wholly-owned

subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

Period, MTPD manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

30.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

### 5.     Philips Entities

31.     Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on demand and prices for CRTs, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture.  During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

32.     Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United

9

States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

33.   Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

34.   Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

35.   Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

### 6.   Samsung Entities

36.   Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung SDI") is a South Korean company with its principal place of business located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  Samsung Electronics Co., Ltd. ("SEC") is South Korea's top electronics company and a major shareholder of Samsung SDI, holding almost 20 percent of Samsung SDI's stock.  Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed, sold and/or distributed CRTs, either directly or through

1  its subsidiaries or affiliates, throughout the United States. SEC dominated and controlled the finances,

2  policies and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

3       37.    Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California

4  corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine,

5  California 92612. Samsung SDI America is a wholly-owned and controlled subsidiary of Defendant

6  Samsung SDI. During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or

7  distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

8  SEC and Defendant Samsung SDI dominated and controlled the finances, policies and affairs of

9  Samsung SDI America relating to the antitrust violations alleged in this complaint.

10       38.    Defendant Samsung SDI Mexico S.A. de C.V. ("Samsung SDI Mexico") is a Mexican

11  company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial

12  El Florido, Tijuana, B.C. Mexico. Samsung SDI Mexico is a wholly-owned and controlled subsidiary of

13  Defendant Samsung SDI. During the Relevant Period, Samsung SDI Mexico manufactured, marketed,

14  sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the

15  United States. SEC and Defendant Samsung SDI dominated and controlled the finances, policies and

16  affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

17       39.    Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company

18  with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480

19  Manaus, Amazonas, Brazil. Samsung SDI Brazil is a wholly-owned and controlled subsidiary of

20  Defendant Samsung SDI. During the Relevant Period, Samsung SDI Brazil manufactured, marketed,

21  sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the

22  United States. SEC and Defendant Samsung SDI dominated and controlled the finances, policies and

23  affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

24       40.    Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese

25  company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.

26  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.

27  During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed

28  CRTs, either directly or through its subsidiaries or affiliates, throughout the United States. SEC and

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1  Defendant Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

2  Shenzhen relating to the antitrust violations alleged in this complaint.

3  41.  Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese

4  company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing

5  County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of

6  Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed,

7  sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the

8  United States.  SEC and Defendant Samsung SDI dominated and controlled the finances, policies and

9  affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

10  42.  Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a

11  Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan

12  Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.  Samsung

13  SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the

14  Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRTs, either

15  directly or through its subsidiaries or affiliates, throughout the United States.  SEC and Defendant

16  Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia

17  relating to the antitrust violations alleged in this complaint.

18  43.  Defendants Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI

19  Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively

20  referred to herein as "Samsung."

21  **7.  Samtel**

22  44.  Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of

23  business located at 52, Community Centre, New Friends Colony, New Delhi-110065.  Samtel's market

24  share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of CRTs.

25  Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its

26  CRTs.  During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRTs,

27  either directly or through its subsidiaries and affiliates, throughout the United States.

28

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

### 8.   Thai CRT

45.     Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.  During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

### 9.   Toshiba Entities

46.     Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation, in which the entities consolidated their CRT businesses.  During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

47.     Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, New York 10020.  Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC.  During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations alleged in this complaint.

48.     Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRTs, either directly or through its

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

49.     Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612. TAEC is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America. During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this complaint.

50.     Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-1697. TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America. During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this complaint.

51.     Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to herein as "Toshiba."

### 10.     Chunghwa Entities

52.     Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan. It was established in 1971 by Tatung Corporation to manufacture CRTs. In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market. Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers. During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRTs either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

53.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu

Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs.  During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRTs either directly or through its subsidiaries or affiliates throughout the United States.  Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

54.     Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."  Moreover, Tatung Co., Ltd. ("Tatung") owns approximately 50 percent of Tatung Company of America and 24 percent of Chunghwa.  Tatung and Chunghwa have overlapping officers and directors, and Tatung effectively dominates and controls Defendant Chunghwa.

### 11.     Thomson Entities

55.     Defendant Thomson SA (now known as Technicolor SA) ("Thomson SA") is a French Corporation with its principal place of business located at 1-5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France.  Thomson SA, on its own or through its wholly-owned subsidiary Thomson Consumer Electronics, Inc., and other subsidiaries, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe.  Thomson SA sold its CRTs internally to its television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  For much of the Relevant Period, the television manufacturing division of Thomson SA manufactured and sold in the United States CRT televisions under the RCA and GE brands.  In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd. ("Videocon") for €240 million.  Simultaneously, Thomson SA invested a total of €240 million in Videocon, comprising a €225 million investment in Videocon Industries, Ltd. and a €15 million investment in Videocon International, and acquired 13.1% of Videocon Industries, Ltd.  The agreement with Videocon provided that Thomson management would help Videocon run the CRT business during the transition period and beyond.  Videocon and Thomson also agreed to set up Preferred Supplier Agreements for Thomson's display components business.  Thomson SA also received at least one seat on Videocon's board of directors when it invested in Videocon Industries, Ltd.  Thomson SA maintained at least a 10% ownership interest in Videocon

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

1   Industries, Ltd. for the remainder of the Relevant Period.  In January 2010, Thomson SA changed its

2   name to Technicolor SA.  During the Relevant Period, Thomson SA manufactured, marketed, sold

3   and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, to customers

4   throughout the United States.

5           56.     Defendant Thomson Consumer Electronics, Inc. (now known as Technicolor USA, Inc.)

6   ("Thomson Consumer") is a United States corporation with its principal place of business located at

7   10330 N Meridian St., Indianapolis, Indiana 46290-1024.  Thomson Consumer is a wholly-owned

8   subsidiary of Thomson SA and was Thomson SA's primary subsidiary for the manufacture and sale of

9   CRTs in the United States during the Relevant Period.  Thomson Consumer was a major manufacturer

10  of CRTs for the United States market, with plants located in Scranton, Pennsylvania; Marion, Indiana;

11  and Mexicali, Mexico.  Thomson Consumer sold its CRTs to television manufacturers in the United

12  States, Mexico and elsewhere.  Thomson Consumer's CRT business was sold by its parent Thomson SA

13  to Videocon Industries, Ltd. in 2005.  Simultaneously, as described above, Thomson Consumer's parent

14  company Thomson SA invested €240 million into Videocon Industries, Ltd. and obtained 13.1%

15  ownership of Videocon Industries, Ltd.  Thomson Consumer was a parent corporation of its wholly-

16  owned subsidiary, Thomson Displays Americas LLC.  In January 2010, Thomson Consumer

17  Electronics, Inc. changed its name to Technicolor USA, Inc.  During the Relevant Period, Thomson

18  Consumer manufactured, marketed, sold and/or distributed CRT Products either directly or through its

19  subsidiaries or affiliates throughout the United States.

20          57.     TCL Thomson Electronics Corporation ("TCL Thomson") is a joint venture formed

21  between Thomson SA and TCL International Holdings Ltd. ("TCL").  TCL Thomson is headquartered

22  at the TCL Building, South Nanhai Road, Nanshan District, Shenzhen, Guangdong, China.  During the

23  Relevant Period, Thomson SA, through the joint venture, manufactured, marketed, sold and/or

24  distributed CRT Products, either directly or indirectly through subsidiaries or affiliates, to customers

25  throughout the United States.  One of the direct or indirect subsidiaries of TCL Thomson or TCL that

26  manufactured, marketed, sold and/or distributed CRT Products in the United States was TTE

27  Technology, Inc. ("TTE").

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

58.     Defendant Thomson SA had sufficient minimum contacts with the United States during the Relevant Period for it to be subject to personal jurisdiction in the United States.  Thomson SA purposefully availed itself of the United States market for CRTs and CRT products.  Thomson SA fixed prices and constrained competition on CRTs it and its wholly-owned subsidiary, Thomson Consumer, sold in the United States.  Thomson SA had significant contacts with the United States, and it dominated and/or controlled the finances, policies, and/or affairs of its U.S.-based subsidiary, Thomson Consumer, relating to the antitrust violations alleged in this Complaint.  During the Relevant Period, Thomson SA was a large multinational industrial and technology company.  Thomson SA was neither a mere holding company nor a corporate shell, and its subsidiaries, including Thomson Consumer, were more than simple investment mechanisms for diversifying risk.  Thomson SA had a controlling role in the operation of its subsidiaries and exercised a central management function over its subsidiaries, including Thomson Consumer, which served the function of servicing the pivotal U.S. CRT market.  During the Relevant Period, between 40-50% of Thomson SA's revenues were derived from the United States, and Thomson SA's CEO described the United States as Thomson SA's most important market.  Thomson SA managed its business centrally, including that of Thomson Consumer, and its management and board of directors set its policies and direction.  Thomson SA employees oversaw the United States profits and losses associated with Thomson Consumer's high-end and value TV businesses.  Thomson SA also was involved in planning and purchasing discussions with U.S. CRT customers, Thomson SA had to approve the purchases made by U.S. customers, and Thomson SA was involved in CRT production and pricing discussions relating to CRTs manufactured in Mexico for the North American market.  During the Relevant Period, many Thomson SA executives also served as executives and/or board members of Thomson Consumer, and Thomson Consumer executives served as executive officers of or directors of Thomson SA, including the Chairman and CEO of Thomson SA who simultaneously served as the President and CEO of Thomson Consumer, and thereafter as the Chairman of Thomson Consumer:

| Name | Role with Thomson SA | Role with Thomson Consumer |
|---|---|---|
| Thierry Breton | Chairman and CEO (1997-2001); Member, Board of Directors | President & CEO (1997-2000); Chairman (1997-2001) |

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

| | | |
|---|---|---|
| | (2002-2005) | |
| Olivier Mallet | Senior Vice President, Finance (1996-2000) | Director (1999-2000) |
| Charles Dehelly | Senior Executive Vice President (1998-2000); Senior Executive Vice President and COO (2001); CEO (2002-2004) | Director (2002-2003) |
| Julian Waldron | Senior Executive Vice President, CFO (2001-2007); Interim CEO and Senior Executive Vice President, CFO (2007-2008) | Director (2001-2007) |
| Frederic Rose | CEO (2008-present) | Chairman (2012-present) |

Moreover, numerous other Thomson SA "Executive Officers" had operational responsibilities in the United States: Jim Meyer was Senior Executive Vice President of SBUs Americas, Multimedia Products and New Media Services; Al Arras was Executive Vice President of SBU Audio and Communications; Michael O'Hara was Senior Vice President of SBU Americas; and Enrique Rodriguez was Vice President of SBU Multimedia Products. All were stationed at Thomson Consumer in Indianapolis, Indiana.

59. Thomson SA and Thomson Consumer are collectively referred to herein as "Thomson."

## 12. Mitsubishi Entities

60. Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a Japanese corporation located at Building 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan. Mitsubishi Electric is a Fortune Global 500 Company that was ranked 214 in 2011 and that had combined net sales of over $44 billion in 2012. It has various subsidiaries operating in the United States, Mexico and Canada. Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico and Canada for sale in the United States. These CRTs were sold internally to

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1  Mitsubishi's television and monitor manufacturing division and to other television and monitor

2  manufacturers in the United States and elsewhere. Mitsubishi's television and monitor division also

3  purchased CRTs from other CRT manufacturers. During the Relevant Period, Mitsubishi Electric Japan

4  manufactured, marketed, sold and distributed CRT Products in the United States.

5        61.    Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric USA") is a

6  United States corporation located at 5665 Plaza Drive, Cypress, California 90630. Mitsubishi Electric

7  USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi Electric USA manufactured

8  CRTs for the United States market in plants located in Mexicali, Mexico and Ontario, Canada.

9  Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing division

10  and to other television and monitor manufacturers in the United States and elsewhere. Mitsubishi's

11  television and monitor division also purchased CRTs from other CRT manufacturers. During the

12  Relevant Period, Mitsubishi Electric USA manufactured, marketed, sold and distributed CRT Products

13  in the United States.

14        62.    Defendant Mitsubishi Electric Visual Solutions America, Inc. (f/k/a Mitsubishi Digital

15  Electronics America, Inc.) ("Mitsubishi Digital") is a United States corporation located at 9351

16  Jeronimo Road, Irvine, California 92618. Mitsubishi Digital is a wholly-owned subsidiary of

17  Mitsubishi Electric Japan. During the Relevant Period, Mitsubishi Digital manufactured, marketed, sold

18  and distributed CRT Products in the United States.

19        63.    Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are

20  collectively referred to herein as "Mitsubishi."

21  **IV.    AGENTS AND CO-CONSPIRATORS**

22        64.    The acts alleged against Defendants in this Complaint were authorized, ordered, or done

23  by their officers, agents, employees, or representatives, while actively engaged in the management and

24  operation of Defendants' businesses or affairs.

25        65.    Each Defendant acted as the principal, agent, or joint venturer of, or for, other Defendants

26  with respect to the acts, violations, and common course of conduct alleged by ViewSonic. Each

27  Defendant that is a subsidiary of a foreign parent acts as the United States agent for CRTs or CRTs

28  made by its parent company.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

66.     Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.  These co-conspirators who are not named as Defendants include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T. Tosummit Electronic Devices Indonesia, Toshiba Display Devices (Thailand) Co., Ltd., Videocon, and Technologies Displays Americas LLC ("TDA").  Videocon and TDA are described in depth in paragraphs 138-140 below.  ViewSonic reserves the right to name some or all of these and other co-conspirators as Defendants at a later date.

67.     During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of CRTs.  Orion was a Korean corporation which filed for bankruptcy in 2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRTs.  Orion was involved in CRTs sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  ViewSonic is informed and believes that Orion was wholly owned by the "Daewoo Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.  The Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.  As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured, marketed, sold and/or distributed CRTs, either directly or through their subsidiaries or affiliates, throughout the United States.

68.     Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

69.     Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.  Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated

20

1   as a wholly owned subsidiary of MTPD until its closure in 2006. During the Relevant Period,

2   Matsushita Malaysia manufactured, marketed, sold and/or distributed CRTs, either directly or through

3   its subsidiaries or affiliates, throughout the United States. Defendant Panasonic Corporation dominated

4   and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust

5   violations alleged in this complaint.

6       70.     P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed

7   by TC, Orion and two other non-Defendant entities in December 1995. TEDI's principal place of

8   business was located in Indonesia. TEDI was projected to have an annual production capacity of 2.3

9   million CRTs by 1999. In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with

10  Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia. During the

11  Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRTs, either directly or

12  through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and

13  controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this

14  complaint.

15      71.     Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its

16  principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum

17  Thani, Thailand 12000. TDDT was a wholly-owned and controlled subsidiary of Defendant TC. In

18  2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation. It was

19  re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled

20  subsidiary of MTPD unit its closure in 2007. During the Relevant Period, TDDT manufactured,

21  marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates,

22  throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs

23  of TDDT relating to the antitrust violations alleged in this complaint.

24      72.     The acts charged in this Complaint have been done by Defendants and their co-

25  conspirators, or were authorized, ordered or done by their respective officers, agents, employees or

26  representatives while actively engaged in the management of each Defendant's or co-conspirator's

27  business or affairs.

28

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

1   V.      **TRADE AND COMMERCE**

2       73.     During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold

3   CRTs in the United States in a continuous and uninterrupted flow of interstate commerce and foreign

4   commerce, including through and into this judicial district.

5       74.     During the Relevant Period, Defendants collectively controlled a vast majority of the

6   market for CRTs, both globally and in the United States.

7       75.     The business activities of Defendants substantially affected interstate trade and commerce

8   in the United States and caused antitrust injury in the United States.  The business activities of

9   Defendants also substantially affected trade and commerce and caused antitrust injuries in California.

10  VI.     **FACTUAL ALLEGATIONS**

11      A.      **CRT Technology**

12      76.     A CRT has three components: (a) one or more electron guns, each of which is a series of

13  metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used

14  to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by

15  an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor

16  produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a

17  polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the

18  faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of

19  thousands of narrow lines of red, green, blue and black.

20      77.     CRT technology was first developed more than a century ago.  The first commercially

21  practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the

22  product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs

23  became the heart of most display products, including televisions, computer monitors, oscilloscopes, air

24  traffic control monitors and ATMs.

25      78.     The quality of a CRT itself determines the quality of the CRT display.  No external

26  control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT

27  product so that the product is often simply referred to as "the CRT."

28

79. Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

80. CRTs can be subdivided into CDTs and CPTs. As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices. The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

81. CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors. The demand for CRTs thus directly derives from the demand for such products.

82. The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRTs products markets. The markets for CRTs and products containing CRTs are, for all intents and purposes, inseparable in that one would not exist without the other.

83. ViewSonic has participated in the market for CRTs through its direct purchases from Defendants of CRTs and its purchases of CRTs indirectly from non-Defendant original equipment manufacturers ("OEM") and others. Defendants' unlawful conspiracy has inflated the prices at which ViewSonic bought CRTs, and ViewSonic has been injured thereby and paid supra-competitive prices for CRTs.

84. ViewSonic has participated in the market for products containing CRTs. To the extent ViewSonic indirectly purchased CRTs as part of a CRT product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products. ViewSonic was not able to pass the inflated prices on to its customers.

85. ViewSonic has been injured by paying supra-competitive prices for CRTs.

**B.    Structure of the CRT Industry**

86. The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

### 1. Market Concentration

87.     During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Defendants Samsung, LGPD (n/k/a LP Displays), MTPD, as well as Chunghwa, together held a collective 78% share of the global CRT market.  The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

### 2. Information Sharing

88.     Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

89.     Defendants Samsung and Chunghwa are members of the Society for Information Display. SEC and Defendant LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics and LP Displays are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3. Consolidation

90.      The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

### 4.   Multiple Interrelated Business Relationships

91.   The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

92.   Examples of the high degree of cooperation among Defendants and others in both the CRT market and other closely related markets include the following:

i.   The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

ii.   Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCDs.

iii.   The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

iv.   Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCDs.

v.   In December 1995, Defendant Toshiba partnered with Orion and two other non-Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

vi.   Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

vii.   Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Chunghwa for large CPTs.

viii.   Defendant Chunghwa has a joint venture with SEC for the production of CRTs. Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

ix.     Defendant LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

x.      Defendant Samtel participates in a joint venture, Samcor Glass Limited, a Samsung affiliate and Corning Inc., USA for the production and supply of picture tube glass.

xi.     Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Philips, and Panasonic.

### 5. High Costs of Entry Into the Industry

93.     There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRTs.

94.     During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.  A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

### 6. The Maturity of the CRT Market

95.     Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT market is a mature one, where there is greater motivation to collude.

96.     Demand for CRTs was declining throughout the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

97.     In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price fixing scheme in order to slow down declining CRT prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

26

98.     Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price fixing conspiracy worthwhile.  Due to the high costs of CRTs and plasma displays during the Relevant Period, a substantial market for CRTs existed as a cheaper alternative to these new technologies.

99.     In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

100.     As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

### 7.     Homogeneity of CRTs

101.     CRTs are commodity-like products which are manufactured in standardized sizes.  One Defendant's CRT for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants sell and ViewSonic purchases CRTs primarily on the basis of price.

102.     It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C.     Pre-Conspiracy Market

103.     The genesis of the CRT conspiracy was in the late 1980s as the CRT business became more international and Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

104.     In the early 1990s, representatives from Samsung, Daewoo, and Chunghwa visited each other's factories in S.E. Asia.  During this period, these producers began to include discussions about price in their meetings.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

**D.**     **Defendants' and Co-Conspirators' Illegal Agreements**

105.     In order to control and maintain profitability during declining demand for CRTs, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

106.     The CRT conspiracy was effectuated through a combination of group and bilateral meetings. In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis. During this period, representatives from Daewoo and Hitachi and Defendants LG Electronics and Samsung visited the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific customers. These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

107.     Defendants Samsung, LG, Mitsubishi and Chunghwa, along with Daewoo, also attended several ad hoc group meetings during this period. The participants at these group meetings also discussed increasing prices for CRTs.

108.     As more manufacturers formally entered the conspiracy, group meetings became more prevalent. Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

109.     The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

**1.**     **"Glass Meetings"**

110.     The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM." Glass meetings were attended by employees at three general levels of Defendants' corporations.

111.     The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings. Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance

with price fixing agreements. Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements. Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

112. The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings. These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

113. Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees. These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements. These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority. The working level meetings also tended to be more regional and often took place near Defendants' factories. In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

114. The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting. The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers. Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of Hitachi Shenzhen and of Defendants, including but not limited to, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

115. Glass meetings also occurred occasionally in various European countries. Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo), IRICO, and Thomson.

116. Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings." These were meetings held on golf courses. The green meetings were generally attended by top and management level employees of Defendants.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

117.    During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, Malaysia, and the United States.

118.    Participants would often exchange competitively sensitive information prior to a glass meeting. This included information on inventories, production, sales and exports. For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

119.    The glass meetings at all levels followed a fairly typical agenda. First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months. The participants also updated the information they had provided in the previous meeting. Each meeting had a rotating, designated "Chairman" who would write the information on a white board. The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter. They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs. They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers. Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

120.    During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions. This was referred to as setting a "bottom price."

121.    Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors. Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs. In this way, Defendants ensured that all direct purchaser OEMs paid supracompetitive prices for CRTs.

122.    Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed. Like CRTs themselves, the market for CRTs was a mature one. Defendants therefore concluded that in order

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers. In this way, Defendants ensured that price increases for CRTs were passed on to indirect purchasers of CRTs.

123.  The agreements reached at the glass meetings included:

    i.    agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

    ii.    placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

    iii.    agreements on pricing for intra-company CRT sales to vertically integrated customers;

    iv.    agreements as to what to tell customers about the reason for a price increase;

    v.    agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

    vi.    agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

    vii.    agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers' demands;

    viii.    agreements to coordinate uniform public statements regarding available capacity and supply;

    ix.    agreements to allocate both overall market shares and share of a particular customer's purchases;

    x.    agreements to allocate customers;

    xi.    agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

    xii.    agreements to keep their meetings secret.

124.  Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of

31

1   Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring;

2   2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3)

3   threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual

4   interest in living up to the target price and living up to the agreements that had been made.

5         125.    As market conditions worsened in 2005-2007, and the rate of replacement of CRTs by

6   TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again

7   became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of

8   TFT-LCDs and so the CRT Defendants and co-conspirators began to have concerns about antitrust

9   issues.

10               **2.**      **Bilateral Discussions**

11         126.    Throughout the Relevant Period, the glass meetings were supplemented by bilateral

12   discussions between various Defendants.  The bilateral discussions were more informal than the group

13   meetings and occurred on a frequent, ad hoc basis, often between the group meetings.  These

14   discussions, usually between sales and marketing employees, took the form of in-person meetings,

15   telephone contacts and emails.

16         127.    During the Relevant Period, in-person bilateral meetings took place in Malaysia,

17   Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil, Mexico,

18   and the United States.

19         128.    The purpose of the bilateral discussions was to exchange information about past and

20   future pricing, confirm production levels, share sales order information, confirm pricing rumors, and

21   coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico, Europe,

22   and the United States.

23         129.    To ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings

24   to coordinate pricing with CRT manufacturers in Brazil, Mexico, and the United States, such as Philips

25   Brazil, Samsung SDI Brazil and Samsung SDI Mexico.  These Brazilian and Mexican CRT

26   manufacturers were particularly important because they served the North American market for CRTs.

27   North America was the largest market for CRT televisions and computer monitors during the Relevant

28   Period.  Because these manufacturers are all wholly-owned and controlled subsidiaries of Philips and

Samsung SDI, they adhered to the unlawful price-fixing agreements. In this way, Defendants ensured that prices of all CRTs sold in the United States were fixed, raised, maintained, and stabilized at supracompetitive levels.

130. Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices. The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

131. Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Mitsubishi, Toshiba, Panasonic, and Samtel. It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and output agreements had been reached during the meeting. For example, LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba. Similarly, Samsung had regular communications with Mitsubishi. And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel. Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics, and Thai CRT. Sometimes Toshiba also attended the glass meetings.

### 3. Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

132. When ViewSonic refers to a corporate family or companies by a single name in alleging participation in the conspiracy, ViewSonic is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings or communications on behalf of every company in that corporate family. The individual participants in the conspiratorial meetings and communications often did not know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individuals who participated in conspiratorial meetings and communications entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented. For the Defendants and co-conspirators identified in the following paragraphs, in

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

1   many instances their high-ranking executives participated in the conspiratorial meetings and

2   communications.

3       133.   Thomson has admitted that it participated in the CRT price-fixing conspiracy.  In its 2011

4   Annual Report (released in late March 2012), Thomson told its shareholders and the public:

5       On January 9, 2008, Thomson/Technicolor received a request under art 18 (2) of Council

6       Regulation n1/2003 from the European Commission (the "EC") also relating to the CRT

7       industry.  Thomson/Technicolor received three further requests for information from the EC on

8       January 16, 2009, January 19, 2009, and September 15, 2009 respectively.  On November 25,

9       2009, Thomson/Technicolor received a Statement of Objections ("SO") from the European

10      Commission.  On March 3, 2010, Thomson/Technicolor filed its written response to the "SO."

11      On May 26 and 27, 2010, Thomson/Technicolor attended an Oral Hearing together with the

12      other parties and the European Commission.  ***Thomson/Technicolor stated that it played a***

13      ***minor role in the alleged anticompetitive conduct.***

14  Technicolor Annual Report 2011, at 226 (emphasis added).  While ViewSonic disputes that Thomson's

15  role in the CRT price-fixing conspiracy was minor and believes the evidence adduced to date

16  demonstrates it was substantial, it cannot be contested that Thomson ***by its own admission*** was one of

17  the conspirators.

18      134.   In December 2012, following an investigation of more than four years, the EC released

19  its findings on the CRT price-fixing conspiracy.  It found that seven companies, including Thomson,

20  participated in cartels lasting "almost ten years, between 1996 and 2006," to fix the prices of CRTs.  The

21  EC concluded that "these companies fixed prices, shared markets, allocated customers between

22  themselves and restricted their output."  The EC official responsible for competition policy described the

23  CRT cartels as "textbook cartels [that] feature all the worst kinds of anticompetitive behavior."  Fines

24  totaling €1,470,515,000 were assessed against the members of the CRT cartels, including a fine of

25  €38,631,000 against Thomson, an amount which was reduced due to Thomson's cooperation with the

26  EC investigation.  The EC investigation found that the CRT cartels "operated worldwide" and were

27  "among the most organized cartels that the Commission has investigated."

28

34

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

135.     After the EC announced its finding that Thomson participated in the CRT price-fixing conspiracy and after Thomson paid the fine imposed by the EC, Thomson again acknowledged its participation in the conspiracy.  In its 2012 Annual Report (released in late March 2013), Thomson informed its shareholders and the public that "[f]ollowing the European Commission decision, purchasers may bring individual claims against the Company seeking compensation for alleged loss suffered as a result of the anti-competitive conduct."  Technicolor Annual Report 2012, at 216.

136.     Between at least 1995 and 2005, Thomson participated in and/or was a party to over 15 bilateral meetings and over 25 group meetings, including "green meetings" in the United States, with the Defendants and co-conspirators in which unlawful agreements as to, inter alia, price, output restrictions, and/or customer and market allocation of CRTs occurred.  These meetings attended by Thomson occurred in the United States, Europe, Japan, and China, and were also attended by representatives from Samsung, MTPD, LGPD, Philips, Toshiba, and Chunghwa, among other co-conspirators.  The purpose of these meetings, and other communications, between Thomson and the co-conspirators was to raise and stabilize the prices and set supply levels of CRTs sold by Thomson and its competitors in North America, including the United States.  Documents reflect that these meetings among competitors did not occur in the context of a customer-supplier relationship.  Thomson also discussed with competitors CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, including for North American CRTs.  A substantial number of these meetings were attended by high level sales, operations, and sourcing managers from Thomson Consumer and/or Thomson SA.  In addition to in-person meetings, Thomson also communicated with its competitors over the telephone and by email.  On information and belief, ViewSonic anticipates additional evidence of Thomson's conspiratorial meetings and/or communications with the Defendants and co-conspirators will be revealed through discovery of Thomson.  As examples of Thomson's active participation in a conspiracy to fix CRT prices during the Relevant Period:

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**



**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**



Thomson SA participated in the conspiracy it its own right and through its wholly-owned subsidiary, Thomson Consumer, through at least 2005, and participated thereafter through Videocon, in which it retained a 13.1% ownership stake after selling its CRT business to Videocon in 2005. Thomson SA maintained at least a 10% ownership interest in Videocon throughout the conspiracy period. Thomson SA never effectively withdrew from this conspiracy.

137.    Thomson Consumer directly participated in the conspiracy in the United States, which was Thomson's largest market for CRTs. Between at least 1995 and 2005, Thomson Consumer knowingly participated in and/or was a party to bilateral and group meetings, including "green meetings" in the United States, in which unlawful agreements as to, inter alia, price, output restrictions, and/or customer and market allocation of U.S.-market CRTs occurred. As examples of Thomson Consumer's active participation in a conspiracy to fix CRT prices during the Relevant Period:

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**



138.   Upon information and belief, between 2005 and 2007, Videocon participated in several glass meetings and multiple bilateral meetings with its competitors, continuing the practice established by Thomson.  These meetings were attended by high level sales and marketing managers and executives from Videocon, including one Thomson employee who sat on Videocon's Board of Directors, and employees who had previously attended meetings on behalf of Thomson.  At these meetings, Videocon discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRT Products.  These meetings included discussions in which Videocon shared information with competitors regarding the U.S. market for CRTs.  Documents reflect that these meetings among competitors did not occur in the context of a customer-supplier relationship.  For

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1  example, Thomson SA received a seat on the Videocon board, and Didier Trutt, the Thomson executive

2  who occupied that Board seat, previously attended a meeting on behalf of Thomson to exchange

3  competitor information with Defendant MTPD in January 2004.  That Thomson executive was later a

4  senior executive at Videocon.  In addition, a Samsung document reflects that Videocon attended a July

5  2006 meeting with Samsung and discussed future prices and production for CPTs.  Videocon never

6  effectively withdrew from this conspiracy.  Thomson SA maintained a 10% interest in Videocon

7  throughout the Conspiracy Period.

8        139.   Technologies Displays Americas LLC (formerly Thomson Displays Americas LLC)

9  ("TDA") is a wholly-owned subsidiary of Videocon.  TDA acquired Thomson's U.S. CRT assets in

10  2005 after a period of cooperation and transition with Thomson entities subsequent to and in connection

11  with the purchase and sale in 2005.  TDA was responsible for the sales and marketing of CRT Products

12  in North America on behalf of its parent company, Videocon.  Upon information and belief, Videocon

13  dominated and/or controlled the finances, policies and/or affairs of TDA and directed its pricing of CRT

14  Products sold to the North America market.  After it acquired Thomson's U.S. CRT business in 2005, at

15  least two former Thomson employees who attended conspiracy meetings on behalf of Thomson, Brunk

16  and Hanrahan, transitioned to work for TDA.  Upon information and belief, between 2005 and 2007,

17  TDA (originally known as Thomson Displays Americas), and its wholly-owned Mexican subsidiary

18  Technologies Displays Mexicana, knowingly participated in conspiracy meetings and/or were parties to

19  the agreements entered at them, individually and through their parent company Videocon.  The prices

20  established by TDA were, thus, the product of conspiratorial communications between Videocon and

21  TDA and their co-conspirators.

22        140.   To the extent Thomson Consumer, TDA, and its Mexican subsidiary Technologies

23  Displays Mexicana, distributed CRTs to direct purchasers, they played a significant role in the

24  conspiracy because Defendants wished to ensure that the prices for such products paid by direct

25  purchasers would not undercut the pricing agreements reached at these various meetings.  Thus,

26  Thomson Consumer, TDA, and Technologies Displays Mexicana were at those meetings and/or were

27  parties to the agreements and were active, knowing participants in this conspiracy.

28

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

141.    Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral and group meetings with its competitors, including but not limited to, Defendants Samsung, Toshiba and Chunghwa.  These meetings were attended by high level sales managers and other senior executives from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices, production, future production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices, customer allocations, and supply levels for CRTs.  In addition to in-person meetings, Mitsubishi also communicated with its competitors by telephone and email.  Examples of Mitsubishi's active participation in the conspiracy to fix CRT prices during the Relevant Period include, but are not limited to:

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**



**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**



All of the above acts, as well as others, were in furtherance of the conspiracy.

142. Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings. These meetings were attended by the highest ranking executives from IRICO. IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers. Through these discussions, IRICO agreed on prices and supply levels for CRTs. None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government. IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

143. Between at least 1995 and 2001, Defendant LG Electronics, through LGEI, participated in at least 100 glass meetings at all levels. After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays). A substantial number of these meetings were attended by the highest ranking executives from LG Electronics. LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis. Through these discussions, LG agreed on prices and supply levels for CRTs. LG Electronics never effectively withdrew from this conspiracy.

144. Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them. To the extent LGEUSA sold and/or distributed CRTs, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings. Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

145. Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from LP Displays. Certain of these high level executives from LP Displays

1    had previously attended meetings on behalf of Defendants LG Electronics and Philips.  LP Displays also

2    engaged in bilateral discussions with other Defendants.  Through these discussions, LP Displays agreed

3    on prices and supply levels for CRTs.

4           146.    Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation

5    and Matsushita Malaysia, participated in several glass meetings.  After 2003, Panasonic participated in

6    the CRT conspiracy through MTPD, its joint venture with Toshiba.  These meetings were attended by

7    high level sales managers from Panasonic and MTPD.  Panasonic also engaged in multiple bilateral

8    discussions with other Defendants.  Through these discussions, Panasonic agreed on prices and supply

9    levels for CRTs.  Panasonic never effectively withdrew from this conspiracy.

10          147.    PCNA was represented at those meetings and was a party to the agreements entered at

11   them.  To the extent PCNA sold and/or distributed CRTs to direct purchasers, it played a significant role

12   in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct

13   purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus, PCNA was

14   an active, knowing participant in the alleged conspiracy.

15          148.    Between at least 2003 and 2006, Defendant MTPD participated in multiple glass

16   meetings and in fact led many of these meetings during the latter years of the conspiracy.  These

17   meetings were attended by high level sales managers from MTPD.  MTPD also engaged in bilateral

18   discussions with other Defendants.  Through these discussions, MTPD agreed on prices and supply

19   levels for CRTs.

20          149.    Between at least 1998 and 2007, Defendant BMCC participated in multiple glass

21   meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC also

22   engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT

23   manufacturers.  Through these discussions, BMCC agreed on prices and supply levels for CRTs.  None

24   of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.

25   BMCC was acting to further its own independent private interests in participating in the alleged

26   conspiracy.

27          150.    Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips

28   Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips participated in the

44

CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by high level executives from Philips.  Philips also engaged in numerous bilateral discussions with other Defendants.  Through these discussions, Philips agreed on prices and supply levels for CRTs.  Philips never effectively withdrew from this conspiracy.

151.    Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them.  To the extent Philips America and Philips Brazil sold and/or distributed CRTs to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

152.    Between at least 1995 and 2007, Defendant Samsung, through Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Samsung.  Samsung also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, Samsung agreed on prices and supply levels for CRTs.

153.    Defendants Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them.  To the extent these companies sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants and their co-conspirators wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

154.    Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT.  These meetings were attended by high level executives from Samtel.  Through these discussions, Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

45

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

155.    Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings. These meetings were attended by the highest ranking executives from Thai CRT. Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel. Through these discussions, Thai CRT agreed on prices and supply levels for CRTs. Thai CRT never effectively withdrew from this conspiracy.

156.    Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI, participated in several glass meetings. After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic. These meetings were attended by high level sales managers from Toshiba and MTPD. Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG. Through these discussions, Toshiba agreed on prices and supply levels for CRTs. Toshiba never effectively withdrew from this conspiracy.

157.    Defendants Toshiba America, TACP, TAEC and TAIS were represented at those meetings and were a party to the agreements entered at them. To the extent Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRTs to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings. Thus, Toshiba America, TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

158.    Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of Chunghwa PT, C.Y. Lin. Chunghwa also engaged in bilateral discussions with each of the other Defendants on a regular basis. Through these discussions, Chunghwa agreed on prices and supply levels for CRTs.

159.    Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Daewoo. Daewoo also engaged in bilateral discussions with other Defendants on a regular basis. Through these discussions, Daewoo agreed on

46

prices and supply levels for CRTs.  Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.  Daewoo never effectively withdrew from this conspiracy.

### E.  The CRT Market During the Conspiracy

160.    Until the last few years, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRTs, generating billions of dollars in annual profits.

161.    The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|-----------------------|------------------------------|--------------------------------|
| 1998 | 90.5                  | $18.9                        | $208                           |
| 1999 | 106.3                 | $19.2                        | $181                           |
| 2000 | 119.0                 | $28.0[1]                     | $235                           |

162.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

163.    Defendants' collusion is evidenced by unusual price movements in the CRT market during the Relevant Period.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Information Display 9/92 p.19.  Despite such predictions, and

---

[1]    Estimated market value of CRT units sold.

the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

164.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

165.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand.  In fact, this price increase was a result of the collusive conduct as herein alleged.

166.    After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

167.    A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price.  'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

168.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Samsung, and Philips were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes. Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

169.    Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

170.    For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization.  There were sudden drops throughout the Relevant Period but to a lesser degree. ViewSonic is informed and believes that these sudden, coordinated drops in factory utilization by

48

Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

171.    During the Relevant Period, while demand in the United States for CRTs continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRTs caused by the entry and popularity of the new generation CRTs and plasma display products. As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

172.    During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRTs. These price increases were despite the declining demand due to the approaching obsolescence of CRTs caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

173.    These price increases and price stability in the market for CRTs during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

## F.    International Government Antitrust Investigations

174.    Defendants' and co-conspirators' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, has been the subject of a multinational investigation commenced by the Antitrust Division of the United States DOJ.

175.    Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

176.    In its 2008 Annual Report, Defendant Toshiba reports that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

177.    On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its investigation into the CRT cartel. The HCA described the cartel as follows:

49

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

178.   On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions. The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry." The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs. Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

179.   On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. Tony Cheng formerly was an assistant Vice-President of Sales and Marketing at

Chunghwa. The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs. Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

180. On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer." The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

181. On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies." The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

182. On March 18, 2011, the DOJ issued a press release announcing that Defendant Samsung SDI Company Ltd. had agreed to plead guilty to participating in a conspiracy to fix the prices of, reduce the output of, and allocate the market for CDTs. The United States and Samsung SDI entered into an amended plea agreement on May 12, 2011, where Samsung SDI paid a $32 million criminal fine and pled guilty to violating the Sherman Antitrust Act, 15 U.S.C. § 1, from at least as early as January 1997, until at least as late as March 2006. The plea specified that, during this period, Samsung SDI, through its officers and employees, participated in a conspiracy among major CDT producers, the primary purpose of which was to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere. In furtherance of the conspiracy, Samsung SDI, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers. During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere. Acts in

furtherance of this conspiracy were carried out within the Northern District of California.  The plea agreement also requires Samsung SDI's cooperation with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

183.    On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

184.    As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

185.    Several Defendants and their affiliated entities also have a history of "cooperation" and anticompetitive conduct.  For example, SEC was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

186.    SEC and Defendant Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

187.    In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

188.    On December 12, 2006, news reports indicated that SEC and Defendant Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.— were all under investigation for price fixing TFT-LCDs.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

189.    On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD Products.

190.    The indictments of LG Display Co., Ltd., Sharp Corporation, and Chunghwa, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

### G.    The Role of Trade Associations During the Relevant Period

191.    Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information. One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association. KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers. Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea. EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries." Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC"). In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

192.    Samsung affiliates and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

193.    The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007. Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics. Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

194.     Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

195.     Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

**H.     Effects of Defendants' Antitrust Violations**

**1.     Examples of Reductions in Manufacturing Capacity by Defendants**

196.     As explained above, during the Relevant Period, the Defendants conspired to limit production of CRTs by shutting down production lines for days at a time and closing or consolidating manufacturing facilities.

197.     In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

198.     In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

199.     In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LGPD, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

200.     In late 2005, Samsung followed the lead of other manufacturers, closing its CRT factory in Germany.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

201.    In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

### 2.      Examples of Collusive Pricing for CRTs

202.    Defendants' collusion is evidenced by unusual price movements in the CRT market.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

203.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

204.    In reality, consumer prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

205.    Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

206.    Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to
> survive in his tough environment and also to prepare for the coming years.
> This means that we have to deviate from the traditional approach of the
> simple scale up of production volume.

207.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

208.    After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

209.    On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

210.    Over the course of the Relevant Period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time.  CRT technology was mature, and the costs of production were relatively low compared to other emerging technologies.  As Finsen Yu, President of Skyworth Macao Commercial Off Shore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology is very mature; prices and technology have become stable."

211.    CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRTs did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

I.    **Summary Of Effects Of The Conspiracy Involving CRTs**

212.    The above combination and conspiracy has had the following effects, among others:

a.    Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

b.    Prices for CRTs sold by Defendants to ViewSonic directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States;

c.    ViewSonic has been deprived of the benefit of free and open competition in the purchase of CRTs; and

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

        d.      As a direct and proximate result of the unlawful conduct of Defendants, ViewSonic has been injured in its business and property in that ViewSonic paid more for CRTs than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VII. VIEWSONIC'S INJURIES

213. As a purchaser of CRTs, ViewSonic has suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain CRT prices at supra-competitive levels. Defendants' conspiracy artificially inflated the price of CRTs, causing ViewSonic to pay higher prices than it would have in the absence of Defendants' conspiracy.

214. ViewSonic also purchased CRTs and products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators. Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy.

215. The OEMs and others passed on to their customers, including ViewSonic, the overcharges caused by Defendants' conspiracy. ViewSonic was not able to pass on to its customers the overcharges caused by Defendants' conspiracy. Thus, ViewSonic suffered injury when it purchased CRTs containing such price-fixed CRTs from the OEMs and others.

216. Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system. CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT product. Thus, CRTs follow a physical chain from Defendants through manufacturers of CRTs sold to ViewSonic.

217. The market for CRTs and the market for products containing CRTs are inextricably linked and cannot be considered separately. Defendants are well aware of this intimate relationship.

218. Throughout the Relevant Period, Defendants controlled the market for CRTs. Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

219.    As a result, ViewSonic was injured in connection with its purchases of CRTs during the Relevant Period.

## VIII.   **FRAUDULENT CONCEALMENT**

220.    ViewSonic had neither actual nor constructive knowledge of the facts supporting its claims for relief despite diligence in trying to discover the pertinent facts.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put ViewSonic on inquiry notice that there was a conspiracy to fix the prices of CRTs.

221.    Because Defendants' agreement, understanding and conspiracy were kept secret, ViewSonic was unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for CRTs.

222.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

223.    As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which Defendant or co-conspirator would first communicate these pretextual statements to customers.

224.    By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

225.    ViewSonic could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

226.     As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy.  Defendants and their co-conspirators agreed not to publicly discuss the existence of the nature of their agreement.  During these meetings, top executives and other officials attending these meetings were instructed on more than one occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants and their co-conspirators not involved in CRT pricing or production. In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret. In order to maintain secrecy, Defendants and their co-conspirators also agreed that the assigned attendees for the meetings should not be changed frequently and agreed that the meeting participants should not discuss the meetings even internally within their respective companies.

227.     Because many of the meetings were held in hotels, Defendants and their co-conspirators tried to cover up traces of the information exchanged and agreed prices.

228.     Defendants' and their co-conspirators' efforts to conceal the conspiracy were intensified by their knowledge of the illegality of their actions.  Internal documents repeatedly show that the conspirators knew their actions were illegal and needed to be concealed.  As but a few examples:

59

229.    Documents from the files of the conspirators shows the extraordinary efforts they undertook to conceal their price-fixing conduct throughout the duration of the conspiracy:

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

230.   Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

231.   As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

232.   As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

233.   In addition, when several CRT manufacturers, including Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

234.   Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

235.   ViewSonic is informed and believes, and thereon alleges, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

236.   As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that ViewSonic has as a result of the anticompetitive conduct alleged in this complaint.

1

## IX.     *AMERICAN PIPE*, GOVERNMENT ACTION AND CROSS-JURISDICTIONAL

2

## TOLLING

3          237.     As discussed at length in paragraphs 178-182 above, the United States Department of

4   Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators

5   commencing on at least February 10, 2009 through the present.  ViewSonic's direct claims for violation

6   of the Sherman Act have been tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

7          238.     ViewSonic's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414

8   U.S. 538 (1974) and related authorities recognizing cross-jurisdictional tolling during the pendency of

9   these Direct Purchaser Class Actions asserted against Defendants, and commencing on at least

10  November 26, 2007.

11         239.     ViewSonic was a member of the Actions asserted against Defendants, including, but not

12  limited to, the following Complaints:

13         •   *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1)

14             (N.D. Cal. Nov. 26, 2007);

15         •   *Radio & TV Equipment, Inc. v. Chunghwa Picture Tubes, Ltd.,* No. 2:08-cv-00542-JAG,

16             (D. N.J. Jan. 28, 2008);

17         •   *Sound Investments Corp. v. Chunghwa Picture Tubes, Ltd.,* No. 2:08-cv-00543-JAG (D.

18             N.J. Jan. 28, 2008); and

19         •   *Direct Purchaser Plaintiffs' Consolidated Amended Complaint*, No. 3:07-cv-05944-SC

20             (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

21  ## X.      CLAIM FOR VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT

22         240.     ViewSonic incorporates by reference all the above allegations as if fully set forth herein.

23         241.     Beginning no later than March 1, 1995, the exact date being unknown to ViewSonic and

24  exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a

25  continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation

26  of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in

27  the United States.

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

242.   In particular, Defendants combined and conspired to raise, fix, maintain or stabilize the prices of CRTs sold in the United States.

243.   As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

244.   The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

245.   For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

a.   participating in meetings and conversations to discuss the prices and supply of CRTs;

b.   communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

c.   agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

d.   issuing price announcements and price quotations in accordance with the agreements reached;

e.   selling CRTs to customers in the United States at noncompetitive prices;

f.   exchanging competitively sensitive information in order to facilitate their conspiracy;

g.   agreeing to maintain or lower production capacity; and

h.   providing false statements to the public to explain increased prices for CRTs.

246.   As a result of Defendants' unlawful conduct, ViewSonic was injured in its businesses and property in that it paid more for CRTs than it otherwise would have paid in the absence of Defendants' unlawful conduct.

247.   Defendants' and their co-conspirators' conduct involved U.S. import trade or commerce and/or had a direct, substantial, and reasonably foreseeable effect on U.S. domestic and import trade or commerce that resulted in the injuries suffered by ViewSonic and gave rise to ViewSonic's antitrust

claims.  As a result, ViewSonic suffered injury as a direct, proximate, and foreseeable result of Defendants and their co-conspirators' conspiracy to fix, raise, stabilize, and maintain the price of CRTs, and are therefore entitled to damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for its purchases of price-fixed CRTs and products containing CRTs manufactured by Defendants and their co-conspirators, and others.

248.    Because the market for production and sale of CRTs remains highly concentrated and susceptible to collusion, Defendants continue to have the incentive to collude to increase CRT prices or stabilize CRT price declines, and Defendants' conspiracy to fix the price of CRTs could be easily repeated and concealed from ViewSonic, ViewSonic faces a serious risk of future injury, and is thus entitled to an injunction under Section 16 of the Clayton Act, 15 U.S.C. § 26, against all Defendants, preventing and restraining the violations alleged herein.

## XI.    PRAYER FOR RELIEF

WHEREFORE, ViewSonic prays that the Court enter judgment on its behalf, adjudging and decreeing that:

A.    Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and ViewSonic was injured in its business and property as a result of Defendants' violations;

B.    ViewSonic shall recover damages sustained, as provided by the federal antitrust laws, and a joint and several judgment in favor of ViewSonic shall be entered against Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.    Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

D.    ViewSonic shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

E.    ViewSonic shall recover its costs of this suit, including reasonable attorneys' fees as

64

1   provided by law; and

2       F.   ViewSonic shall receive such other or further relief as may be just and proper.

3   **XII.   JURY TRIAL DEMAND**

4       Pursuant to Federal Rule of Civil Procedure 38(b), ViewSonic demands a trial by jury of all the

5   claims asserted in this Complaint so triable.

6

7   Dated:  May 30, 2014                    Respectfully submitted,

8                                       _____/s/ Jason C. Murray_____
                                        Jason C. Murray (CA Bar No. 169806)
9                                       CROWELL & MORING LLP
                                        515 South Flower St., 40th Floor
10                                      Los Angeles, CA  90071
                                        Telephone:  213-443-5582
11                                      Facsimile:  213-622-2690
                                        Email: jmurray@crowell.com
12
                                        Jerome A. Murphy (*pro hac vice*)
13                                      Astor H.L. Heaven (*pro hac vice*)
                                        CROWELL & MORING LLP
14                                      1001 Pennsylvania Avenue, N.W.
                                        Washington, D.C. 20004
15                                      Telephone:  202-624-2500
                                        Facsimile:  202-628-5116
16                                      E-mail:  jmurphy@crowell.com
                                                 aheaven@crowell.com
17
                                        *Counsel for ViewSonic Corporation*
18

19

20

21

22

23

24

25

26

27

28

                                        COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF